IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 24, 2021

**YANGREEK TUT WAL v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2012-C-1981     Cheryl A. Blackburn, Judge**

_____

**No. M2020-00646-CCA-R3-PC**

_____

The Petitioner, Yangreek Tut Wal, appeals the Davidson County Criminal Court's denial of his post-conviction petition, seeking relief from his guilty pleas to two counts of especially aggravated kidnapping and two counts of especially aggravated robbery and resulting effective sentence of forty years to be served at one hundred percent. On appeal, the Petitioner contends that he received the ineffective assistance of counsel, which resulted in his guilty pleas being unknowing and involuntary. Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

C. LeAnn Smith, Nashville, Tennessee, for the appellant, Yangreek Tut Wal.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Glenn Funk, District Attorney General; and Megan King and Doug Thurman, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

In July 2012, the Davidson County Grand Jury indicted the Petitioner; his brother, Duol Tut Wal; and his cousin, Tut Tut; for the especially aggravated kidnapping of P.T., the especially aggravated kidnapping of R.W., the especially aggravated robbery of P.T., the especially aggravated robbery of R.W., two counts of aggravated rape of P.T.,[1] and two

_____

[1] It is the policy of this court to refer to victims of sexual crimes by their initials.

counts of aggravated rape of R.W., all Class A felonies.[2]  In November 2013, the grand jury returned an eight-count indictment charging the Petitioner's cousin, Peterpal Tutlam, with the same offenses.[3]

The police arrested Duol Wal and Tut Tut on March 19, 2012, two days after the crimes, but the Petitioner and Tutlam fled Tennessee.  In July 2012, the Petitioner was arrested in Nebraska.  On April 12, 2013, he pled guilty to two counts of especially aggravated kidnapping and two counts of especially aggravated robbery.  Pursuant to his plea agreement, the trial court was to determine the length and manner of service of the sentences.  However, the agreement provided that if the Petitioner testified truthfully at the trials of Tut Tut and Tutlam, who was still on the run, the State would recommend concurrent sentencing to the trial court.  In exchange for the Petitioner's guilty pleas, the State dismissed the aggravated rape charges.

At the Petitioner's guilty plea hearing, Assistant District Attorney General Bret Gunn announced that the Petitioner was pleading guilty to two counts of especially aggravated kidnapping and two counts of especially aggravated robbery and requested that the trial court "hold the sentencing hearing in abeyance" until the trials of Tut Tut and Tutlam.  General Gunn advised the trial court, "If he does what we want him to do in any of the remaining trials, with the exception of his brother's trial, then the State will recommend at the sentencing hearing that these counts run concurrent."  General Gunn stated that the recommendation for concurrent sentencing "is in my discretion as to whether to make it according to how he's done and how he's testified and participated" and acknowledged that regardless of the recommendation, the ultimate decision regarding concurrent or consecutive sentencing would be left to the trial court.

The trial court questioned the Petitioner, noting that he was "set to go to trial on Monday."  The trial court informed the Petitioner that his range of punishment for especially aggravated kidnapping and especially aggravated robbery was fifteen to twenty-five years, that the trial court would hold a sentencing hearing to determine "whether or not they're going to run concurrent with each other or run consecutive to each other," and that the Petitioner would have to serve the sentences at one hundred percent.  The trial court

---

[2] Tut Tut, who was fifteen years old at the time of the crimes, originally was charged in the Davidson County Juvenile Court.  Tut Mayal Tut v. State, No. M2016-01673-CCA-R3-PC, 2017 WL 3475532, at *1 (Tenn. Crim. App. at Nashville, Aug. 14, 2017).  However, that court eventually transferred his case to the criminal court.  Id.

[3] This court may take judicial notice of its own records.  State v. Lawson, 291 S.W.3d 864, 869 (Tenn. 2009).  Due to the nature of this case, we have taken judicial notice of this court's records in State v. Peterpal T. Tutlam, No. M2016-01659-CCA-R3-CD, 2018 WL 2338206 (Tenn. Crim. App. at Nashville, May 23, 2018); Tut Mayal Tut, No. M2016-01673-CCA-R3-PC, 2017 WL 3475532; and State v. Yangreek Tut Wal, No. M2016-01672-CCA-R3-CD, 2017 WL 2875925 (Tenn. Crim. App. at Nashville, July 6, 2017), to assist in our review.

told the Petitioner that the State's recommendation for concurrent sentencing "might enter into this" but that "I'm going to look at the situation and see." The trial court asked if the Petitioner was satisfied with trial counsel's representation, and the Petitioner answered, "No, not really. . . . It's like he's been pressuring me to do stuff like on this case." The Petitioner acknowledged that he was dissatisfied with the State's plea offer and said that he had wanted trial counsel to "see if I could get the minimum." The trial court informed the Petitioner that the plea offer was "up to the State" and asked him, "[T]he fact that [trial counsel] has not been able to do that, is that affecting your willingness to enter this plea?" The Petitioner responded, "No, ma'am." The trial court advised the Petitioner that the "benefit" of his guilty pleas was that "there are four counts that have been taken off the table" and that "[t]he State may make a recommendation, they may not."

The State then gave the following factual account of the crimes:

> If this case had gone to trial, the State's proof would be that on March the 17th of 2012 [the Petitioner] and Mr. Duol Wal and Mr. Tut Tut and Mr. [Peterpal Tutlam] were together in the early morning hours, and they accosted the two victims in this case, [R.W.] and [P.T.], outside [R.W.'s] residence. And they abducted them and forced . . . them to get into a vehicle at knifepoint. In the vehicle they demanded their property. They demanded their bank cards and their PIN numbers. They drove to a Regions Bank where they got an amount of money out of both persons' accounts. They also with the knife repeatedly stabbed [R.W.] and [P.T.] in the legs, arms, and face. They forced [R.W.] and [P.T.] to perform oral sex on each other. They made them take off their clothes, and they forced them out of the car naked.

> The victims sought help immediately. Police were able to get the video or still photographs from the ATM. [The Petitioner] was the one that went to the ATM and got the money. He was able to be identified, which led to his brother, Duol Wal. The police went to their residence. They found the car that was used that had quite an amount of blood in it, although, they had attempted to clean it up. They found items in the trash can that belonged to the victims that were bloody. They found items in Mr. Duol Wal's room, including the knife that was used to stab the men. They found money, they found property that belonged to the two victims.

> [The Petitioner] and Mr. [Peterpal Tutlam] fled the jurisdiction to Nebraska where [the Petitioner] was arrested there. He was interviewed -- he was caught there and interviewed by the detectives in Nebraska and then ultimately by Detective Dozier that went out there. He admitted what had

happened. He named the people that were involved. He maintained that he was the driver of the vehicle [and] had no role in the sexual part of this case. All of these events occurred here in Davidson County.

At the conclusion of the hearing, the trial court accepted the Petitioner's guilty pleas.

That same day, Tut Tut pled guilty to all eight counts. Pursuant to his plea agreement, he received an effective sentence of thirty years to be served at one hundred percent. As a result of Tut's guilty pleas, the Petitioner did not have to testify against him as required by the Petitioner's plea agreement. At some point, Duol Wal pled guilty to two counts of especially aggravated robbery and two counts of especially aggravated kidnapping and received an effective thirty-year sentence to be served at one hundred percent. In exchange for Duol Wal's guilty pleas, the State dismissed the aggravated rape charges.

In September 2013, law enforcement arrested Tutlam in Minnesota. The State dismissed two of his aggravated rape charges, and his trial for two counts of especially aggravated kidnapping, two counts of especially aggravated robbery, and two counts of aggravated rape began on January 4, 2016. During the trial, numerous witnesses, including the victims and the Petitioner, testified for the State. This court summarized the Petitioner's testimony as follows:

> [The Petitioner] testified that he; his brother, Duol Wal; and his cousins, Tut Tut and [Tutlam], were at a reggae nightclub in the early morning hours of March 17, 2012. They decided to rob someone and went to an apartment complex. [The Petitioner], who was driving, waited in the car while his brother and cousins got out; they returned to the car with the victims. [Tutlam] sat on the center console beside [the Petitioner], Tut Tut sat in the passenger seat beside [Tutlam], and Duol Wal sat in the backseat with the victims. [The Petitioner] testified about driving to the ATMs and using the victims' bank cards to withdraw money. He also testified about the four men beating and stabbing the victims; forcing them to engage in oral sex; and leaving them, albeit clothed, on "a little street." Two days after the incident, [the Petitioner] and [Tutlam] boarded a Greyhound bus and fled to Lincoln, Nebraska. They stayed together in Nebraska for a month, split up, and went to different parts of Minnesota.
>
> On cross-examination, [the Petitioner] acknowledged that [Tutlam] had been drinking alcohol prior to going to the nightclub and that he continued to consume alcohol at the club. [Tutlam] was very intoxicated and was stumbling and dragging his feet. [The Petitioner] acknowledged that he

- 4 -

had not yet been sentenced and that he was hoping for leniency in sentencing. On redirect examination, [the Petitioner] acknowledged that [Tutlam] helped shove the victims into the car.

State v. Peterpal T. Tutlam, No. M2016-01659-CCA-R3-CD, 2018 WL 2338206, at *3 (Tenn. Crim. App. at Nashville, May 23, 2018).

At the conclusion of the proof, the jury convicted Tutlam of all six counts. Id. at *1. The trial court held a sentencing hearing, sentenced him to twenty-five years for each conviction, and ordered that he serve the sentences consecutively for a total effective sentence of one hundred fifty years to be served at one hundred percent. Id. On direct appeal of Tutlam's convictions, he argued only that his effective sentence was excessive. Id. This court affirmed the judgments of the trial court. Id.

Two months after Tutlam's trial, Assistant District Attorneys General Megan King and Doug Thurman, who had taken over the Petitioner's case from General Gunn, filed a motion for consecutive sentencing in the Petitioner's case, arguing that the Petitioner was a dangerous offender. In the motion, the State alleged as follows:

After the [Petitioner] was arrested, he attempted to mislead both Nebraska and Tennessee detectives about who was involved and what happened. During his interviews with the detectives, he made the following false assertions:

A. He claimed only three people were involved and did not name Peterpal Tutlam.

B. He eventually gave the name of the fourth person, Chudier Timothy, but claimed he did not know any other name for Chudier Timothy (who was his cousin, Peterpal Tutlam).

C. He first claimed that they were in a gray Impala that belonged to his cousin Marcus Beas. He later admitted they were in a black Saturn that was bought by his brother.

D. He first claimed that he and Chudier Timothy stayed in the car for the initial attack. The proof established that Peterpal Tutlam participated in the initial attack.

E. He initially told Nebraska detectives that the victims were only stabbed four or five times in the legs, and no other

violence occurred. The proof at trial established they were stabbed at least ten times each and were continuously beaten throughout the encounter.

F. When first describing the offenses, he did not mention the aggravated rapes.

G. He stated that the victims were not forced to take their clothes off on Franklin Limestone Road. The proof established that multiple voices were heard telling the victims to take their clothes off. The victims did take their clothing off and were found nude on Franklin Limestone Road.

H. He claimed that only Tut Tut stomped on the victims at Franklin Limestone Road. [P.T.] saw the [Petitioner], Peterpal Tutlam and Tut Tut stomping and kicking [R.W.] while on Franklin Limestone Road. [P.T.] testified that Duol Wal was standing near him as this occurred.

I. He told the detectives that they all split the money from the robbery. At trial, he claimed Peterpal Tutlam did not take a share of the money.

At the trial of Peterpal Tutlam, the [Petitioner] attempted to assist in Tutlam minimizing his (Tutlam's) role in the offenses. He testified as follows:

J. He stated that Tutlam did not beat or stab the victims. In fact, he testified that Tutlam never turned around while in the car and interacted with the victims. This contradicted the testimony of the victims that everyone took turns beating and stabbing them. They also testified that the person over the console and [the] person in the passenger seat switched back and forth during the stabbings and beatings.

K. He claimed that he and Peterpal Tutlam stayed in the vehicle when the victims were dropped off on Franklin Limestone Road. This contradicted [P.T.'s] testimony that three of the defendants were stomping and kicking [R.W.].

- 6 -

L.   He testified that Peterpal Tutlam was drunk during the commission of the offenses.  This was the first time he made this claim.  This contradicted the testimony of the victims.

M.   He testified that Peterpal Tutlam did not take any money from the robbery.  This was the first time he made this claim. He never provided this information to detectives when being interviewed.

N.   He testified that Peterpal Tutlam said, "What y'all did to the victims was uncalled for."  This was the first time he made this assertion.  He never provided this information to detectives when being interviewed.

The State submits that the [Petitioner's] attempts to mislead the police and continue to mislead the jury at trial about Peterpal Tutlam's involvement, as well as his own involvement, and coupled with the severity of the offenses firmly supports the finding that the [Petitioner] is a dangerous offender.

The trial court sentenced the Petitioner on July 13, 2016, more than three years after his guilty pleas.  During the sentencing hearing, Detective Brandon Dozier of the Metropolitan Nashville Police Department testified that he was the lead detective in this case.  After the Petitioner was arrested in Nebraska, a Nebraska detective interviewed him. Detective Dozier then flew to Nebraska and interviewed the Petitioner.  Initially, the Petitioner claimed that only he, Tut Tut, and Duol Wal were involved in the crimes.  He did not mention Tutlam.  Eventually, though, the Petitioner named the fourth suspect as "Chudier Timothy."  Chudier Timothy turned out to be Tutlam.  The Petitioner told Detective Dozier that the car used in the crimes was a gray Impala when it was a black Saturn.  The Petitioner claimed Chudier Timothy was "just in the car" and did not participate in stabbing or beating the victims.  The Petitioner maintained that claim when he testified at Tutlam's trial.  The Petitioner also claimed at Tutlam's trial that the defendants did not order the victims to take off their clothes; that Tutlam did not take any share of the money obtained from the victims; that the Petitioner told his codefendants the day after the crimes that "what ya'll did to the victims was uncalled for"; and that Tutlam was intoxicated during the crimes.  The Petitioner had never told the detectives prior to Tutlam's trial that Tutlam was intoxicated.

Detective Dozier testified that when he interviewed the Petitioner, the Petitioner placed himself at the scene of the crimes but "seemed very limited and he was . . . either trying to omit information or downplay the facts."  The Petitioner also seemed to be protecting Tutlam.  At the time of the Petitioner's interview, Tutlam had not been arrested.

Although the Petitioner claimed that the victims were not forced to take off their clothes, their clothing was found in the Petitioner's residence.

On cross-examination, Detective Dozier acknowledged that people knew Tutlam as "Chudier Timothy." He also acknowledged that the Petitioner consistently maintained that that Tutlam did not participate in the violence against the victims. While the Petitioner was in jail, the Petitioner spoke with Tutlam on the telephone. Their conversations were recorded, and the Petitioner helped Detective Dozier and General Gunn by translating the conversations from the Nuer language to English. Detective Dozier said he did not remember if the translated conversations helped the police locate and arrest Tutlam.

At the conclusion of the Petitioner's sentencing hearing, the trial court sentenced him to twenty years for each conviction. The trial court ordered that he serve the twenty-year sentences for the especially aggravated kidnappings concurrently and that he serve the twenty-year sentences for the especially aggravated robberies concurrently. However, the trial court found that the Petitioner was a dangerous offender and ordered that he serve the two effective twenty-year sentences consecutively for a total effective sentence of forty years to be served at one hundred percent. On direct appeal of his convictions to this court, the Petitioner claimed that that the trial court abused its discretion by imposing an effective forty-year sentence because the sentence was "far in excess" of the sentences imposed on Duol Wal and Tut Tut and because the trial court erred by finding that he was a dangerous offender. State v. Yangreek Tut Wal, No. M2016-01672-CCA-R3-CD, 2017 WL 2875925, at *3 (Tenn. Crim. App. at Nashville, July 6, 2017), perm. app. denied, (Tenn. July 6, 2017). This court concluded that the record "fully support[ed]" the trial court's sentencing decisions and affirmed the judgments of the trial court. Id. at *5.

The Petitioner filed a pro se motion for reduction of sentence pursuant to Tennessee Rule of Criminal Procedure 35, asserting that he should serve his sentences concurrently. The trial court filed a written order denying the motion, stating as follows: "Based on the facts underlying the [Petitioner's] convictions, this court finds the imposition of consecutive sentencing appropriate in this matter. Any reduction in the [Petitioner's] 40-year effective sentence would not be 'in the interest of justice.'" (Citations omitted.)

After our supreme court denied the Petitioner's application for permission to appeal, he filed a timely pro se petition for post-conviction relief, claiming, in pertinent part, that trial counsel was ineffective for advising and allowing him "to enter an open plea of guilty, with no specific plea agreement as to the amount [of] time Petitioner would receive in exchange for his pleas." The Petitioner asserted that as a result of trial counsel's deficient performance, his effective sentence exceeded those of Duol Wal and Tut Tut by ten years when those two codefendants "were the actual perpetrators of the crime." The post-conviction court appointed counsel, and post-conviction counsel filed an amended petition,

adding that trial counsel also was ineffective for failing to explain to the Petitioner that the State's interpretation of his "truthful" testimony would be completely subjective, for failing to file a motion to withdraw the Petitioner's guilty pleas when it became clear that the State was not going to recommend concurrent sentencing, and for failing to address the "down-right misrepresentation[s]" the State made to the trial court in the State's argument for consecutive sentencing. As an example of the State's misrepresentations to the trial court, the Petitioner noted that one of the reasons the State gave for consecutive sentencing was the fact that he named the fourth suspect as "Chudier Timothy" rather than "Peterpal Tutlam"; however, Tutlam was known as "Chudier Timothy." The Petitioner also argued in his amended petition that the State was well-aware of many of the discrepancies between the Petitioner's and the victims' versions of the crimes prior to the Petitioner's guilty pleas; therefore, the State should not have used those discrepancies to recommend consecutive sentencing. The Petitioner requested that the post-conviction court "return [him] to pre-sentencing status."

At the evidentiary hearing, trial counsel testified for the Petitioner that he was licensed to practice law in 2009 and that he was appointed to represent the Petitioner in August 2012. At that time, General Gunn represented the State. General Gunn knew that the Petitioner was the driver during the crimes and that the Petitioner took money out of a victim's ATM. However, General Gunn did not think the Petitioner was involved in the physical or sexual violence against the victims. General Gunn thought that "the most violent actors" were Duol Wal and Tut Tut and offered to let those two defendants plead guilty in exchange for an effective thirty-year sentence to be served at one hundred percent. General Gunn told trial counsel that if the Petitioner would testify against Tut Tut and Tutlam, then General Gunn would give the Petitioner "the opportunity to essentially get between fifteen and twenty-five years, which was less than the other two were getting." General Gunn also would recommend concurrent sentencing. Initially, General Gunn's offer to the Petitioner required guilty pleas to all eight counts in the indictment. However, the Petitioner had "a big problem" with the aggravated rape counts, so trial counsel was "able to negotiate a flat-out dismissal" of those counts, which "saved" the Petitioner from having to register as a sex offender. General Gunn also offered the Petitioner a second plea option: "a flat thirty years" on all the counts, including the aggravated rapes. However, the Petitioner was not willing to accept that offer. Trial counsel said he did not remember if he approached the State about allowing the Petitioner to accept the thirty-year offer and dismissing the aggravated rape charges.

Trial counsel testified that he thought General Gunn met with the Petitioner prior to the Petitioner's guilty pleas to explain General Gunn's "expectations" of the Petitioner. Nevertheless, the Petitioner's having to "testify truthfully" was "fairly vague" and "ended up being a big problem" for the defense. Moreover, Tutlam was still "in the wind" when the Petitioner pled guilty, so the Petitioner "ended up sitting for pretty much four years

before they finally caught Tutlam and were able to bring him to trial." While law enforcement was looking for Tutlam, General Gunn wanted the Petitioner to speak with Tutlam and find out where Tutlam might be located. The Petitioner had recorded telephone conversations with Tutlam and translated those conversation from Nuer to English for General Gunn. Trial counsel thought the Petitioner "[did] what he could" to help the State while he was in confinement.

Trial counsel testified that at some point, General Gunn left the district attorney's office. Generals King and Thurman were assigned to the Petitioner's case and met with the Petitioner in preparation for Tutlam's trial. They wanted the Petitioner to testify that Tutlam received money from the robberies and that Tutlam "had been violent at a specific time in the incident or in a specific way." The Petitioner told them, though, that Tutlam did not receive any money. In the State's view, the Petitioner's claim contradicted one of his original statements to detectives. Moreover, the Petitioner "was not describing [Tutlam's] involvement in some of the violence in the way that the state wanted him to describe it." Trial counsel said the Petitioner "always maintained that what he said is the truth based on his recollection." However, the Petitioner's failure to testify as the State wanted "absolutely tanked his case for him." Trial counsel said the Petitioner's contradictions were "always a matter of interpretation."

Trial counsel testified that "a fatal flaw" of the plea agreement was that it did not specify what would happen if law enforcement never caught Tutlam or what would happen if Tutlam pled guilty. Potentially, the Petitioner "could have sat in jail for decades without ever having a sentencing hearing." Additionally, "the recommendation for concurrent versus consecutive sentencing was entirely subjective, because we never established by proffer or anything else what was going to be the baseline for his testimony." As a result, trial counsel's and the Petitioner's "understanding of how this plea was going to work was misguided or flawed from the get-go."

Trial counsel testified that the Petitioner's "best chance" for a sentence of less than thirty years was to cooperate with the State and obtain a recommendation for concurrent sentencing from General Gunn. Trial counsel said, though, "What I failed to probably advise [the Petitioner] and what I probably failed to consider myself is that the recommendation, you know, even the assessment of truthfulness was 100 percent subjective, and that probably the likelihood of ever getting that kind of concurrent sentencing was nonexistent." Trial counsel never told the Petitioner that he would receive a sentence of fifteen or twenty years but "likely said this was his best chance to get something less than twenty-five." Trial counsel said that during the Petitioner's first meeting with General King and General Thurman, "it was clear that [the Petitioner] was not testifying to the facts as Ms. King and Mr. Thurman understood them." The State filed

a motion for consecutive sentencing, but trial counsel never considered filing a motion to set aside the Petitioner's guilty pleas.

Trial counsel testified that he did not remember telling the Petitioner that the trial court could reject the State's recommendation for concurrent sentencing but that the trial court advised the Petitioner of that fact during the plea hearing. The State relied on "one or two minor facts" to say that it was absolved from any contractual obligation to recommend concurrent sentencing. For example, the Petitioner knew Tutlam as "Chudier Timothy," so trial counsel did not understand the State's claim that the Petitioner was dishonest about Tutlam's name. Trial counsel said that he did not remember if he clarified the name discrepancy to the trial court at sentencing but that "I definitely should have if I didn't." The State also relied on discrepancies between the Petitioner's statements to the Nebraska detective and his statements to Detective Dozier, but those discrepancies would have been evident to the State prior to the Petitioner's plea offer and plea hearing. The Petitioner initially told Nebraska detectives that the car used during the crimes was a gray Impala but eventually said the car was a black Saturn. Again, the State would have been aware of that discrepancy prior to the Petitioner's plea offer and plea hearing. Trial counsel said that the Petitioner's "impression and timeline of the actual sequence of events was different from the victims." The State considered the victims' versions of the crimes to be the truth, and anything the Petitioner said that contradicted the victims was "taken as a lie or an intent to deceive." Most of the discrepancies listed in the State's motion for consecutive sentencing would have been evident to the State prior to the Petitioner's plea offer and plea hearing. Therefore, the State should not have used those discrepancies as an excuse not to recommend concurrent sentencing. Trial counsel did not point out to the trial court at sentencing that the discrepancies existed prior to the Petitioner's guilty pleas.

Trial counsel testified that another problem for the Petitioner was that he told detectives that all four of the defendants "split" the money they obtained from the victims. While preparing for Tutlam's trial, though, the Petitioner claimed that Tutlam "didn't take his share of the money." Trial counsel said that that discrepancy was the "linchpin" of the State's decision not to recommend concurrent sentencing. Trial counsel acknowledged that according to a transcript of the Petitioner's interview with Nebraska detectives, the Petitioner told them that "we all split the money." However, at that time, the Petitioner had not told the detectives that Chudier Timothy was involved in the crimes. Trial counsel said that during his representation of the Petitioner, the Petitioner maintained "100 percent" that Tutlam never received any money from the robberies.

Trial counsel testified that in hindsight, the Petitioner's plea agreement was never going to "work out" because the Petitioner either had to lie at Tutlam's trial and say what the State wanted him to say or tell the truth and not get the State's recommendation for concurrent sentencing. Trial counsel testified that the Petitioner cooperated with the State

and testified truthfully. From the State's perspective, though, the Petitioner "didn't testify about their version of the truth."

On cross-examination, trial counsel testified that in April 2013, eighty to ninety percent of his practice involved criminal law. Trial counsel met with the Petitioner out of court and when the Petitioner appeared in court. They discussed the charges and possible defenses, reviewed discovery, discussed the possible punishments if convicted, and reviewed the plea agreement. Trial counsel acknowledged that he had the Petitioner initial every "point" in the agreement and explained every point to him, including that the trial court could order consecutive sentencing. The Petitioner decided to accept the State's plea offer.

Trial counsel testified that General Gunn never met with the Petitioner to discuss the Petitioner's testimony at Tutlam's upcoming trial. When General Thurman and General King took over the case, they told trial counsel that if they thought the Petitioner testified truthfully at Tutlam's upcoming trial, they would recommend concurrent sentencing. General Thurman and General King met with trial counsel and the Petitioner two or three times to discuss the Petitioner's proposed testimony. During one of those meetings, they told trial counsel that they did not think the Petitioner was being truthful because the Petitioner's version of events differed from the victims' versions. Trial counsel acknowledged that the Petitioner had told Detective Dozier that the defendants obtained $1,200 from the victims, that the Petitioner kept $300, and that the defendants "split the money." However, the Petitioner testified at Tutlam's trial that Tutlam refused to accept Tutlam's share of the money. General King confronted the Petitioner about that inconsistency, and the Petitioner admitted changing his story. The Petitioner claimed for the first time at Tutlam's trial that Tutlam was "drunk" on the night of the crimes. The Petitioner also testified that he never saw Tutlam do anything to the victims and that the Petitioner did not get out of the Saturn when the defendants released the victims, which contradicted the victims' testimony.

Trial counsel acknowledged that at the Petitioner's sentencing hearing, he presented letters and certificates on the Petitioner's behalf, cross-examined Detective Dozier about the Petitioner's "inconsistencies," and called a witness to testify for the Petitioner. The trial court sentenced Tutlam to an effective sentence of one hundred fifty years to be served at one hundred percent but sentenced the Petitioner to an effective sentence of forty years to be served at one hundred percent. On redirect-examination, trial counsel acknowledged that he should have responded to some of the "inconsistencies" raised by the State at the sentencing hearing.

The Petitioner testified that he cooperated with law enforcement in this case. He took responsibility for the crimes, translated his conversations with Tutlam for the State,

testified against Tutlam at Tutlam's trial, and did everything the State asked of him. He acknowledged that he tried to testify at Tutlam's trial consistently with his statements to the Nebraska and the Nashville detectives. When the Petitioner testified at trial that Tutlam did not take any money from the robberies, the Petitioner's testimony was consistent with his statements to the detectives.

The Petitioner testified that when he entered into the plea agreement with the State, he thought that he was going to receive a sentence of fifteen to twenty-five years in exchange for his truthful testimony against Tut and Tutlam. The Petitioner did not understand the concept of an "open" plea and did not understand the subjective nature of his plea agreement. The Petitioner also did not understand that the State could decide not to recommend concurrent sentencing or that the trial court could reject the State's recommendation for concurrent sentencing. Trial counsel never told the Petitioner that he could receive an effective sentence of one hundred years in confinement, and trial counsel never told the Petitioner that his testimony at Tutlam's trial had to match his statements to the detectives. Trial counsel never told the Petitioner about the State's thirty-year offer on all eight counts, and they never discussed withdrawing the Petitioner's guilty pleas before his sentencing hearing.

The Petitioner acknowledged that trial counsel went over his plea agreement form with him and that trial counsel wrote as follows on the form: "Sentencing hearing to determine the length within the range concurrent/consecutive if the defendant testifies truthfully at the trial of Tut Tut and Peterpal." The Petitioner said that he testified truthfully at Tutlam's trial to the best of his ability and that the inconsistencies between his testimony and the victims' testimony was "just the wording." The Petitioner always maintained that Tutlam did not accept any money from the robberies, and the State was aware of most of the inconsistencies listed in its motion for consecutive sentencing before the Petitioner pled guilty. The Petitioner acknowledged that trial counsel should have filed a response to the State's motion and should have disputed the alleged inconsistencies at sentencing.

On cross-examination, the Petitioner acknowledged that trial counsel met with him in and out of court and that they reviewed discovery. The Petitioner also acknowledged that at the outset of his plea hearing, General Gunn advised the trial court that the State could recommend concurrent sentencing but that the trial court could reject the recommendation. The trial court also advised the Petitioner during the plea hearing that he could receive consecutive sentencing. General Thurman and General King met with the Petitioner prior to Tutlam's trial and warned him that he had to testify truthfully.

In a written order, the post-conviction court denied the petition for post-conviction relief. First, the post-conviction court addressed the Petitioner's claim that trial counsel was ineffective for failing to explain the consequences of his "open" guilty pleas. The

post-conviction court discredited the Petitioner's claim that trial counsel did not explain the consequences of his pleas, noting that the written plea agreement provided that the trial court would determine the length and manner of service of the sentences, that the Petitioner initialed each paragraph of the agreement, and that he signed the agreement. The post-conviction court also noted that the trial court "explicitly addressed" concurrent and consecutive sentencing during the plea hearing and that the Petitioner said he understood. The post-conviction court recalled that during the plea hearing, the State advised the trial court that its recommendation for concurrent sentencing was dependent upon the Petitioner's compliance and that the trial court reiterated during the plea colloquy that the State may or may not recommend consecutive sentencing. Finally, the post-conviction court accredited trial counsel's testimony that he explained the plea agreement, including the possibility of consecutive sentencing, to the Petitioner. Accordingly, the post-conviction court found that the Petitioner failed to demonstrate that trial counsel rendered deficient performance or that he was prejudiced by any deficiency.

Next, the post-conviction court addressed the Petitioner's claim that trial counsel was ineffective for failing to file a motion to withdraw the Petitioner's guilty pleas when it became evident that the State was not going to recommend concurrent sentencing. The trial court noted that post-conviction counsel did not ask trial counsel why he did not file the motion and that, in any event, the Petitioner "did not, and still does not, want to go to trial." The post-conviction court noted that the Petitioner filed a motion for a reduction of sentence, which the trial court denied, and concluded that the Petitioner failed to show that trial counsel was deficient or that he was prejudiced by any deficiency.

Finally, the post-conviction court addressed the Petitioner's claim that he did not plead guilty knowingly and voluntarily. The post-conviction court stated that during the Petitioner's plea colloquy, the trial court explained the consequences of his guilty pleas and the rights he was waiving and that the Petitioner said he understood. The post-conviction court reiterated that General Gunn advised the trial court in the Petitioner's presence that the State could recommend concurrent sentencing but that the issue of concurrent or consecutive sentencing would be determined by the trial court. The trial court then advised the Petitioner that his range of punishment for each offense was fifteen to twenty-five years to be served at one hundred percent and that the trial court would impose concurrent or consecutive sentencing after a sentencing hearing. The Petitioner confirmed to the trial court that he read the plea agreement, that he initialed the paragraphs of the agreement, and that he signed the agreement. The post-conviction court noted that although the Petitioner indicated to the trial court that he was not satisfied with the State's plea offer, he said he wanted to proceed with his guilty pleas. The post-conviction court concluded that the guilty plea hearing transcript and the record demonstrated that the Petitioner entered his pleas knowingly and voluntarily.

## II. Analysis

On appeal, the Petitioner contends that he received the ineffective assistance of counsel because trial counsel "failed to procure a more definitive" explanation of what the State expected from him in the plea agreement, failed to hold the State accountable for not recommending concurrent sentencing, and failed to file a motion to withdraw his guilty pleas when it became evident that the State was not going to recommend concurrent sentencing. The Petitioner also contends that because trial counsel failed to have a clear understanding of the plea agreement, trial counsel was unable to explain the consequences of his "open" guilty pleas, which resulted in his pleas being unknowing and involuntary. The State argues that the Petitioner has failed to demonstrate that he was prejudiced by trial counsel's alleged deficiencies or that his guilty pleas were unknowing and involuntary. We agree with the State.

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Further,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697). Moreover, in the context of a guilty plea, "the petitioner must show 'prejudice' by demonstrating that, but for counsel's errors, he would not have pleaded guilty but would have insisted upon going to trial." Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998); see also Hill v. Lockhart, 474 U.S. 52, 59 (1985).

When a defendant enters a plea of guilty, certain constitutional rights are waived, including the privilege against self-incrimination, the right to confront witnesses, and the right to a trial by jury. Boykin v. Alabama, 395 U.S. 238, 243 (1969). Therefore, in order to comply with constitutional requirements a guilty plea must be a "voluntary and intelligent choice among the alternative courses of action open to the defendant." North Carolina v. Alford, 400 U.S. 25, 31 (1970). In order to ensure that a defendant understands the constitutional rights being relinquished, the trial court must advise the defendant of the consequences of a guilty plea, and determine whether the defendant understands those consequences. Boykin, 395 U.S. at 244.

In determining whether the petitioner's guilty pleas were knowing and voluntary, this court looks to the following factors:

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993).

Turning to the Petitioner's claim that trial counsel was ineffective, trial counsel testified that he failed to recognize the subjective nature of the plea agreement, that he failed to explain the subjective nature of the agreement to the Petitioner, and that he failed to challenge many of the reasons the State gave at sentencing for requesting consecutive

sentencing. However, even if trial counsel was deficient, we agree with the State that the Petitioner has failed to demonstrate prejudice. The Petitioner was well-aware that the issue of concurrent sentencing ultimately rested with the trial court. During the Petitioner's sentencing hearing, the trial court stated, "I was not involved in the sentencing of either Mr. Tut Tut or Mr. Duol Wal. And I can assure you that had I been that the sentences would not have been what they are given what I know about this case." The trial court's comments demonstrate that it did not think total concurrent sentencing for an effective sentence of twenty-five years was appropriate in this case. Therefore, the Petitioner has failed to show that even if the State had recommended concurrent sentencing, the trial court would have ordered concurrent sentencing. We note that this same trial court ordered that Tutlam serve all of his sentences consecutively for a total effective sentence of one hundred fifty years. The trial court also could have ordered that the Petitioner serve all of his sentences consecutively for a total effective sentence of eighty years. Instead, the trial court ordered partial consecutive sentencing for a total effective sentence of forty years. While the Petitioner's effective sentence was ten years more than the effective sentence of Duol Wal, who pled guilty to the same offenses, it was far less than Tutlam's sentence.

As to the Petitioner's claim that trial counsel was ineffective for failing to file a motion to withdraw his guilty pleas when it became evident that the State was not going to recommend concurrent sentencing, Tennessee Rule of Criminal Procedure 32(f)(1) provides that a trial court may grant a motion to withdraw a guilty plea "for any fair and just reason" prior to sentencing. Here, post-conviction counsel did not ask trial counsel why he never considered filing a motion to withdraw the Petitioner's guilty pleas. However, as noted by the post-conviction court, the Petitioner advised the post-conviction court that he did not want to go to trial. Likewise, the Petitioner asserts in this appeal that he wants post-conviction relief in the form of resentencing. Therefore, the Petitioner has failed to show that trial counsel was ineffective for failing to file a motion to withdraw his guilty pleas.

Turning to the Petitioner's claim that he did not plead guilty knowingly and voluntarily, the post-conviction court accredited trial counsel's testimony that he explained the plea agreement to the Petitioner, that he had the Petitioner initial each paragraph of the agreement, and that he had the Petitioner sign the agreement. Our review of the agreement confirms that the Petitioner initialed every paragraph and that trial counsel wrote on the agreement that the Petitioner was pleading guilty to two counts of especially aggravated kidnapping and two counts of especially aggravated robbery. Trial counsel also wrote on the agreement that the Petitioner was facing sentences of fifteen to twenty-five years to be served at one hundred percent for each conviction and that a sentencing hearing would be held "to determine Length w/in Range, concurrent/consecutive." Trial counsel then wrote, "If Defendant testifies truthfully at Trial of Tut Tut & [Peterpal], recommendation of concurrent." The Petitioner signed the plea agreement.

At the guilty plea hearing, General Gunn advised the trial court about the terms of the plea agreement in the Petitioner's presence, including that the State would recommend concurrent sentencing if the Petitioner testified truthfully at the upcoming trials of Tut Tut and Tutlam. General Gunn also advised the trial court that the ultimate decision regarding concurrent sentencing would be left to the trial court. During the plea colloquy, the trial court asked the Petitioner several times if he understood that the trial court could order consecutive sentencing, and the Petitioner said yes. When the trial court asked the Petitioner if he was satisfied with trial counsel's representation, the Petitioner said that trial counsel had been "pressuring [him] to do stuff" and that he was dissatisfied with the plea agreement because he had wanted trial counsel to "get the minimum." Nevertheless, he said he wanted to proceed with his guilty pleas.

The record demonstrates that the Petitioner was nineteen years old at the time of the plea hearing. During the hearing, he told the trial court that trial counsel had explained the charges to him, that they had reviewed discovery, and that they had discussed possible defenses. The Petitioner also told the trial court that he was a high school graduate, that he could read, and that he and trial counsel had reviewed the plea agreement together. The trial court asked if the Petitioner was having any trouble understanding what he was doing and if he was taking any medication, and the Petitioner answered both questions in the negative. At the post-conviction evidentiary hearing, trial counsel testified that the aggravated rape charges were "a big problem" for the Petitioner, that trial counsel was able to negotiate a plea agreement in which the State would dismiss those charges, and that the Petitioner decided to plead guilty. Had the Petitioner not pled guilty, he was facing a trial for eight Class A felonies and an effective sentence much greater than the effective forty-year sentence he actually received. Accordingly, we conclude that the Petitioner has failed to show that he did not plead guilty knowingly and voluntarily.

## III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE